## A WORD AS TO THE WEAKNESS OF THE PRESENT JURY SYSTEM.

### Superior Court of Cincinnati.

### HENRY PERRY v. EDWARDS MANUFACTURING CO.

### Decided, December 14, 1915.

*Misconduct—On the Part of a Jury Deliberating on a Case—Not Shown by Discussion of Defendant's Ability to Pay—Some of the Trials of a Trial Judge.*

It is not misconduct justifying a new trial for a jury, while deliberating upon a case, to discuss the defendant's ability to pay the amount of its verdict. And when, upon a second trial of a case, a second verdict for the plaintiff has been returned, it will not be set aside merely because the court is of a contrary opinion, when there is testimony to support it and it is not inconsistent with the charge of the court.

*Thomas L. Michie,* for plaintiff.
*Aaron A. Ferris* and *Thos. H. Morrow,* contra.

OPPENHEIMER, J.

Memorandum on motion for new trial.

This case was once before tried in this court, and a verdict for the plaintiff returned. On May 28th last the court of appeals reversed the case and remanded it for a new trial because of error in the charge of the court. 22 C.C.(N.S.), 422. Plaintiff had executed a release to the defendant, which he sought to set aside upon the ground that it had been obtained by fraud and misrepresentation. The court charged that the presumption of truth which followed the written release might be overcome by a preponderance of the evidence. It is held that this was error, and that for the purpose of avoiding such release clear and convincing proof must be adduced. The case was again tried, and the court was careful to frame its charge in accordance with the view expressed by the court of appeals. A second verdict for the plaintiff was returned, and counsel now seeks to have it set aside upon ten distinct grounds. Nine of these grounds are simi-

lar to those which were urged on the first trial of the case, and as they were not in any way touched upon by the court of appeals, we are justified in assuming that this court, as to these matters, was not in error. We therefore pass them by without comment.

But counsel for defendant now urge, in addition to the causes previously alleged, that the jury was guilty of gross misconduct. They state that one of the jurors, after the case had been terminated, informed them that during the discussion of the case in the jury room, it was suggested that defendant could readily pay the amount of the verdict out of its earnings for one week, as was indicated by a statement which had recently appeared in the newspapers to the effect that it had declined to accept a war order for a million dollars. Counsel seem to be much astonished at the fact that such considerations can possibly enter into the minds of jurors who are sworn to decide the case solely according to the evidence which is introduced in the course of the trial, and the law as it is interpreted by the court.

Strange as it may seem, we can not share counsel's astonishment or indignation. Indeed, an experience of three years upon the bench has perceptibly diminished our reverence for that ancient institution, the jury. We have reached the point where we should be astonished by nothing short of a jury which conforms with counsel's ideal. The truth of the matter is that we have long permitted ourselves to be misled by such pompous, high-sounding phrases as "the sanctity of the jury system" and "the inviolability of the right of trial by jury." We have made the jury the subject of much extravagant panegyric, and have even found evidence of its sacred character in Holy Writ, pointing with reverential awe to the twelve apostles, twelve tribes, twelve stones, etc. We have forgotten some of the circumstances and conditions which called the jury into existence, and have proceeded upon an assumption that its antiquity has placed it beyond reproach. The world moves on apace; systems of government change; industrial relationships grow more complex; legal principles are modified to meet altered economic and social conditions, but our jury system goes forever on in all its pristine simplicity and with all its inherent defects.

In the days when judges were appointed by irresponsible tyrants who were naturally covetous of the possessions of their subjects, a jury of men who were totally free from control was, of course, a necessary safeguard of life and property. When the founders of our country severed their relationship with England, they, with recent evidences of judicial tyranny before them, threw about the jury every possible precaution against extraneous influence. They made the judge "a mere functionary to preserve order and lend ceremonial dignity to the proceedings," instead of "the directing and controlling mind at the trial." They deprived him of practically all power on the administrative side of legal procedure, while in his judicial capacity they demanded of him a divine perfection to which mere human beings can not even approximate.

But times have changed. Our government is, at least in theory, now under the control of the people, and our judges, whether elected directly by the people, or appointed by their agents, must be supposed to represent the people. And so the need for the jury as a political weapon of defense has now disappeared. However, we still temporarily call together from their ordinary avocations twelve men who are totally untrained in their new duties, and then deprive them of the counsel, advice and assistance of the only presumably trained and impartial mind in the court room. We reduce the judge to a mere figure-head or referee in a contest between two forensic gladiators. He must sit silent, unless a breach of the peace is threatened, when he is permitted gently to admonish counsel to be reasonable—but with due care lest his remarks may prejudice the jury against either of the offenders. Meanwhile, he must rule upon all disputed questions of law without opportunity for investigation or thought, and he must rule correctly under penalty of reversal by a court which has ample opportunity to study the questions upon which he has passed. The jury may guess wrongly without fear of consequences. It may err egregiously in its understanding or construction of the evidence—and no one may question its judgment. But "in every sound which the judge utters there lurks the possibility of reversible error." Almost every question which is propounded to him in the course of the trial re-

lates directly or indirectly to the evidence; and yet if he even suggests to the jury the impression which such evidence makes upon his own mind, or gives a reason for his ruling which may reveal an opinion, he is in danger of nullifying the entire proceedings. Until we make it possible for a judge to assist the jury in arriving at an intelligent understanding of the facts, we can not hope for relief from the present evils of the jury system. This we may do by permitting him to give the jury the benefit of his experience and skill in handling evidence and in determining its weight and effect. No obligatory instructions on the facts need be given, for this would of course eliminate the jury; but advice should be given them in necessary cases. And this advice may and doubtless will be disregarded whenever it is apparently unsound. In England this method is followed, and no one now questions its propriety or expediency.

We are by no means alone in our criticism of the jury system. Trial judges and lawyers of large experience are constantly raising their voices against the frequent miscarriages of justice which attend present methods. Yet our only available remedy is to set aside verdicts where some rule of law has been flagrantly violated, and to re-submit cases to new juries which are as likely to err as their predecessors. Of course this entails endless delays and the expenditure of large sums of money; but we are so prodigal of time and wasteful of money that we do not seem to regard these circumstances at all.

We have borrowed our jury system from England. In the federal courts the reforms so successfully adopted in England have been largely followed; but in our state courts, we cling to the ancient forms which make our modern cry for "substantial justice" a mere mockery—a siren's song wherewith to lull the easily satisfied to sleep. And the worst part of it all is that the limitation is self-imposed. There is nothing in our Constitution and nothing in our statutes to require a continuance of this evil. The rule is simply "judge-made" law; but so long as appellate courts insist, as did the court in the case of *Hazen* v. *Morrison & Snodgrass Co.*, 14 C.C.(N.S.), 483, that where "remarks" made by a trial judge "exhibit an opinion on the part of the judge as to the credibility of witnesses or an opinion on his

part as to the facts in the case, prejudicial error results and a reversal becomes necessary,'' trial judges will be bound to pursue the even tenor of their ineffective way.

Under the present system, every possible opportunity is given for the manifestation of those human prejudices, frailties and idiosyncracies which are possessed by the average jury. A jury is simply an aggregation of twelve human beings. It is usually sympathetic. Its composite heart goes out to the weak and helpless. It would exercise charity toward those who, in the struggle for existence, have met with disaster—especially when it can do so with funds furnished by others. And when an injured and indigent workman is placed in juxtaposition with a prosperous corporation, it can not refrain from making invidious comparisons. It would not knowingly or wilfully violate an oath or disregard instructions of the court upon any questions of law; but perhaps it has not understood those instructions—indeed, the court itself may not have understood them. And so, having no assistance from the court in its consideration of the evidence, its sympathies are given full play so long as the results which it reaches are consistent with the charge as their untrained minds have interpreted it.

Perhaps some day we shall go even a step farther, and adopt the plan, so successfully tried in New York, of a court of special sessions, consisting of several judges who pass upon questions of both law and fact; or we shall try questions of fact before adequately compensated commissioners who are made to appreciate their duties and responsibilities, who are selected in some measure because of their fitness, and who will not be disqualified to act merely because they are acquainted with the milkman who serves the plaintiff or with the barber who shaves the defendant. We shall not spend much valuable time and large sums of money (furnished, of course, by the long-suffering tax-payers) in the selection of a jury, only to find that its sole qualification when it has been accepted is that its members do not read newspapers and have not as yet learned of the termination of the Civil War.

We are unable to see the present case as the jury has seen it. The verdict is necessarily based upon the assumption that all witnesses, with the exception of the plaintiff himself, are wilful

perjurers, or at least that they are wonderfully economical of the truth. (And it may be parenthetically remarked that the plaintiff is the only *interested witness,* because defendant is amply protected by a policy of insurance.) But the jury had the right to take that view of the case, and as we are only judges of law, and not of facts, we are bound by the verdict.

We are therefore constrained, with profound regret, to overrule the motion for a new trial. Our only consolation is that two barristers of large experience and excellent reputation have suddenly discovered the inherent weakness of our jury system.